UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN CLYDE TIGHE,

                    Petitioner,                Case No. 1:12-cv-1314

v.                                      Honorable Janet T. Neff

MARY BERGHUIS,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury in the Cass County Circuit Court of three counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(a) (person under 13), and three counts of second-degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c(1)(a) (person under 13). The trial court sentenced him on August 29, 2008, to imprisonment of 20 to 40 years for each of the CSC I convictions and 7 to 15 years for each of the CSC II convictions. In his *pro se* petition, Petitioner raises 19 grounds for relief, as follows:

I.      [PETITIONER'S] CONSTITUTIONAL DUE PROCESS RIGHTS AND RIGHT TO NOTICE WERE VIOLATED FOR THE LENGTH OF TIME COVERED BY THE INFORMATION (6 YEARS) AND THE LACK OF SPECIFICITY OF WHEN THE SPECIFIC CHARGED EVENTS TOOK PLACE AS WELL AS THE FACT THAT SIX CHARGES FOR SEPARATE CRIMES WERE TRIED TOGETHER.

II.     THE TRIAL COURT DENIED [PETITIONER] A FAIR TRIAL AND HIS DUE PROCESS RIGHTS BY: ERRING IN HIS EVIDENTIARY RULINGS BY ALLOWING IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE BEFORE THE JURY INCLUDING SO-CALLED "SIMILAR ACTS" TESTIMONY UNDER MRE 404(B) AND MCL 768.27a; ALLOWING IMPROPER EXPERT TESTIMONY INTO EVIDENCE;

ALLOWING IMPROPER IMPEACHMENT; NOT ALLOWING [PETITIONER] AN EVIDENTIARY HEARING ON THE QUESTION OF INEFFECTIVE ASSISTANCE OF COUNSEL; AND DENYING [PETITIONER'S] MOTIONS TO CORRECT INVALID SENTENCE AND FOR A NEW TRIAL.

III.  THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY USING REASONS NOT SUBSTANTIAL AND COMPELLING NOR OBJECTIVE AND VERIFIABLE WHEN SENTENCING ABOVE THE GUIDELINES, THOSE REASONS ALSO BEING ADEQUATELY TAKEN INTO ACCOUNT BY THE GUIDELINES.  ALSO, HE USED HIS PERSONAL OPINION AND PHILOSOPHY DURING SENTENCING, AND FACTS NOT PROVED BEYOND A REASONABLE DOUBT BEFORE A JURY, ALL OF WHICH REQUIRE RESENTENCING.

IV.  [PETITIONER'S] SENTENCE MUST BE REVERSED BECAUSE IT WAS DISPROPORTIONATE.

V.  [PETITIONER] RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

VI.  [PETITIONER'S] CONVICTION SHOULD BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT CREDIBLE EVIDENCE AT TRIAL TO PROVE [PETITIONER] GUILTY OF THE CRIMES.

VII.  THE PROSECUTOR'S ACTIONS DENIED [PETITIONER] A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS.

VIII.  [PETITIONER'S] SENTENCES WERE INVALID BECAUSE THEY WERE BASED ON INACCURATE INFORMATION, i.e., IMPROPER SCORING OF THE LEGISLATIVELY IMPOSED SENTENCING GUIDELINES, USE OF AN INCORRECT BURDEN OF PROOF, AND INSUFFICIENT FACTS[.] THEREFORE, HIS DUE PROCESS RIGHTS WERE VIOLATED.

IX.  CORRECTLY SCORING THE GUIDELINES WOULD REQUIRE RESENTECING.

X.  [PETITIONER] WAS DENIED HIS RIGHT TO A FAIR TRIAL AND IMPARTIAL JURY TRIAL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL COURT REFUSED TO REMOVE, SUA SPONTE, BIAS[ED] JUROR FOR CAUSE.

XI.     [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL GUARANTEED TO HIM BY THE U.S. CONST., AMEND. VI; CONST. 1963, ART. 1, SEC. 17 AND 20.

XII.    [PETITIONER] WAS DENIED A COMPLETE RECORD FOR APPEAL BECAUSE THE JULY 25, 2008, MOTION HEARING WAS NOT RECORDED WHICH STULTIFIED APPELLATE REVIEW; AND TRANSCRIPTION ERRORS HAVE ADVERSELY AFFECTED [PETITIONER'S] ABILITY TO OBTAIN POST-CONVICTION RELIEF, CONTRARY TO U.S. CONST. AMS. I, VI & XIV.

XIII.   [PETITIONER] WAS DENIED DUE PROCESS AND A FAIR TRIAL BECAUSE THE PROSECUTOR KNOWINGLY USED FALSE, COACHED AND PERJURED TESTIMONY THROUGH DISCOVERY SUPPRESSION, CONTRARY TO U.S. CONST., AMS. V, VI & XIV.

XIV.    ORAL ARGUMENT IS A SUBSTANTIVE OPPORTUNITY, NOT JUST A DISCRETIONARY PRIVILEGE BECAUSE A PARTY CAN SET THE RECORD STRAIGHT BY RESPONDING TO ANY FLAWED LEGAL FACTUAL CONCLUSION WHICH NOT ONLY REDUCES THE COST OF LITIGATION, IT ADVANCES JUDICIAL ECONOMY THROUGH ACCURACY IN A FULLY INFORMED JUDGMENT PROVIDED BY U.S. CONST. AMS. V, VI & XIV.

XV.     [PETITIONER] WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY A MULTIPLICITY OF ERRORS HAVING A CUMULATIVE EFFECT ON THE OUTCOME OF TRIAL BECAUSE IT DENIED FAIRNESS, DUE PROCESS AND EQUAL PROTECTION.

XVI.    PETITIONER WAS DENIED HIS FUNDAMENTAL DUE PROCESS PROTECTIONS TO A FAIR TRIAL AS GUARANTEED UNDER BOTH STATE AND FEDERAL CONSTITUTIONS WHEN THE TRIAL COURT ARRAIGNED PETITIONER IN CIRCUIT COURT WITHOUT FIRST HAVING ACQUIRED SUBJECT-MATTER JURISDICTION; THUS CREATING A JURISDICTIONAL DEFECT WHICH NOT ONLY VOIDS PETITIONER'S CRIMINAL CONVICTIONS, BUT WHICH DEMANDS PETITIONER'S IMMEDIATE RELEASE FROM CUSTODY.

XVII.   PETITIONER WAS DENIED HIS FUNDAMENTAL DUE PROCESS PROTECTIONS TO A FAIR TRIAL AS GUARANTEED UNDER BOTH STATE AND FEDERAL CONSTITUTIONS WHEN THE PROSECUTION FAILED TO SUPERVISE LAW ENFORCEMENT WHO DESTROYED EXCULPATORY EVIDENCE AND WHO ALSO DENIED PETITIONER OF HIS STATUTORY RIGHT TO SUBMIT TO A POLYGRAPH EXAMINATION, WHICH RESULTED IN A

JURISDICTIONAL DEFECT, AND WHICH DEMANDS PETITIONER'S IMMEDIATE RELEASE FROM PRISON.

XVIII. PETITIONER WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL AS GUARANTEED UNDER BOTH STATE AND FEDERAL CONSTITUTIONS, WHEN TRIAL COUNSEL REFUSED TO PREPARE A DEFENSE STRATEGY, REFUSED TO INVESTIGATE WITNESSES, REFUSED TO INFORM PETITIONER THAT HE PASSED THE POLYGRAPH EXAMINATION, AND REFUSED TO OBJECT TO PROSECUTORIAL MISCONDUCT; ALL CALCULATED TO SABOTAGE PETITIONER'S CRIMINAL PROCEEDINGS, WHICH ABANDONMENT IS NOTHING LESS THAN STRUCTURAL ERROR.

XIX. PETITIONER WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL AS GUARANTEED UNDER BOTH STATE AND FEDERAL CONSTITUTIONS, WHEN APPELLATE COUNSEL ABANDONED PETITIONER ON HIS APPEAL AS OF RIGHT.

Respondent has filed an answer to the petition (ECF No.11) stating that the grounds should be denied because they are procedurally defaulted or are without merit. Petitioner filed a reply (ECF. No. 42). Upon review and applying the AEDPA standards, I find that Grounds XII-XV are procedurally defaulted and the remaining grounds do not warrant habeas corpus relief. Accordingly, I recommend that the petition be denied.

## Procedural History

### I.    Trial Court Proceedings

The charges in this case stemmed from Petitioner's sexual assaults of his minor step-granddaughter from 2001 to 2004 or 2005. Petitioner was tried before a jury beginning July 29, 2008, and concluding on July 31, 2008.[1]

---

[1] The transcripts of the three days of trial will be referenced as follows:

July 29, 2008 (ECF No. 27):  "Tr. I at ___."
July 30, 2008 (ECF No. 28):  "Tr. II at ___."
July 31, 2008 (ECF No. 29):  "Tr. III at ___."

The victim, Carlie Ray, testified that she was 14-years-old at the time of trial and would have been 8-years-old in 2001. (Tr. I at 146.) Carlie identified Petitioner as her paternal grandmother's husband. (Tr. I at 147.) Carlie's parents, Kenny Ray and Denise Houck were divorced and her father had visitation with her every other weekend. (*Id*.) On those weekends, Carlie often spent Saturday night at her grandmother's house in Cass County so she could go to church on Sunday with her grandmother and Petitioner. (Tr. I at 147-49.) When she stayed at her grandmother's house, Carlie slept in her Aunt Brandy's former bedroom. (Tr. I at 150.) Carlie testified that while she was sleeping, Petitioner started to touch her vagina underneath her clothes. (Tr. I at 148-49.) She was 8 or 9 years old the first time it happened. (Tr. I at 149.) The first time the touching occurred, Carlie was wearing a shirt, shorts and panties. When she woke up, her shorts and panties were pulled down between her knees and feet, and Petitioner was sitting on the end of the bed touching her vagina. (Tr. I at 150-52.) Carlie tried to move and roll over to make him stop, but he rolled her back and continued to touch her. (Tr. I at 152-53.) Petitioner did not say anything. (Tr. I at 153.) Carlie was scared and pretended to be asleep, although she opened her eyes enough during some of the episodes to know that it was Petitioner who was touching her. (Tr. I at 155.) Carlie did not know how many time Petitioner touched her vagina in this way, but was more than five times. (Tr. I at 154-55.) The touching never occurred if someone else, like Carlie's stepsister, was sleeping with her. (Tr. I at 156.)

A time came where the touching changed and Petitioner began to put his finger inside her vagina. (Tr. I at 154.) The first time that happened, Carlie kept trying to roll over to make him stop, but he kept his finger in her vagina. (Tr. I at 158.) She opened her eyes a little bit and saw Petitioner. (*Id.*) Petitioner put his finger inside her on three or four occasions, and it hurt each time

he did it.  (Tr. I at 159-60.)  Carlie testified that the incidents occurred from the time she was eight until she was eleven or twelve.  (Tr. I at 160.)  Most of the incidents occurred during the summer when she spent the night more often.  (Tr. I at 170, 173.)  She believed that last incident occurred when she was twelve, the summer before she started sixth grade.  (Tr. I at 160.)  Carlie remembered hearing Petitioner's voice on a couple of occasions, but did not remember what he said.  (Tr. I at 161-62.)  Petitioner bought things like toys and clothes for Carlie and she went camping and on vacations with Petitioner and her grandmother.  Carlie did not remember Petitioner touching her inappropriately during any of those trips, although they all stayed in the same room.  (Tr. I at 162.)  Carlie stopped spending the night at her grandmother's house shortly after the last incident because she had realized that what Petitioner was doing was wrong and began to feel very uncomfortable.  (Tr. I at 163-64.)

Carlie testified that she did not tell anyone about the touching because she was afraid that something worse would happen to her.  (Tr. I at 164.)  She first told her brother about Petitioner's touching her because she trusted him.  (Tr. I at 164-67.)  She told him while they were communicating over the internet via MySpace.  (*Id*.)  Carlie was upset and crying when she was typing the message to her brother.  (Tr. I at 166-67.)  She wanted her brother to tell her mother because she wanted her mother to know, but was too afraid to tell her.  (Tr. I at 167-68.)  After Carlie told her brother, she got a call from her mother and they talked about what had happened.  (Tr. I at 184.)

On cross-examination Carlie testified that she lived with her mother, but spent time with her father, who was a police officer.  (Tr. I at 175.)  Carlie did not tell her father after Petitioner touched her.   (Tr. I at 177.)  In sixth grade, Carlie received instruction at school about good

touching and bad touching, but she did not tell any of the teachers or her classmates about what had happened to her.  (*Id*. at 177.)  In seventh grade, Carlie's best friend told Carlie that she had been molested, but Carlie did not tell her friend what had happened with Petitioner.  (Tr. I at 178-99.) Carlie testified that she had a good relationship with her mother and did not think her mother would be mad if somebody was doing something to hurt her.  (Tr. I at 179.)  Petitioner never threatened her, but she was afraid that something bad would happen if she told anyone.  (Tr. I at 182-83.) Carlie told her brother about the sexual abuse in 2007 because they had become closer and she trusted him.  (Tr. I, 183.)  She also knew that he would tell her parents and she wanted them to know.  (Tr. I, 185.)

Carlie testified that she did not recall telling Barb Welke that she never opened her eyes during the incidents.  (Tr. I at 187.) Looking back, Carlie remembered seeing and feeling what happened to her.  (*Id*.)  Sometimes she opened her eyes and sometimes she did not.  *(Id*.)  Carlie estimated that the incidents occurred 50 to 100 times.  (Tr. I at 190.)  Only three or four of those incidents involved penetration.  (Tr. I at 192.)

Josh Fedeli, Carlie's brother, testified that he and Carlie were having a discussion on MySpace when Carlie disclosed that she had been sexually abused.  (Tr. I at 213-215.)  Josh called his mother and told her what Carlie had told him.  (Tr. I at 215-16.)  Josh testified that Petitioner spent more time with Carlie than with the other grandchildren in the family and was more affectionate towards her.  (Tr. I at 217-18.)  Petitioner also bought more stuff for Carlie than the other grandchildren.  (*Id*.)

Denise Houck, Carlie's mother, testified that she received information from her son, Joshua, about Carlie being sexually abused by Petitioner.  (Tr. I at 221-22.)  After Denise received

that information, she went to the state police post in Niles to file a report.  (Tr. I at 222.)  Denise testified that Carlie has been different since the revelation of the sexual abuse.  Carlie was very angry, had missed a lot of school and started to have seizures.  (Tr. I at 222-23.)  When Carlie was 9 or 10, she started telling Houck that she did not want to go over to her grandmother's house, so Denise did not make her go when Carlie was with her.  (Tr. I at 223-24.)  Carlie never told Denise why she did not want to go.  (Tr. I at 224.)  Scott Houck, Carlie's stepfather, testified that Carlie had lived with him and Denise since she was 8-years-old.  (Tr. I at 227.)  Scott testified that there were times when Carlie did not want to go her grandmother's house, but felt obligated.  *(Id.)*  Scott did not notice any fear or unusual behavior on Carlie's part associated with going to visit her grandmother.  (Tr. I at 227-28.)

Kenneth Robert Ray, Carlie's father, testified that he was a reserve police officer for the Niles City Police Department.  (Tr. I at 230.)  Ray and Denise were divorced in 1995.  (Tr. I at 229.)  Ray had visitation with Carlie on Wednesdays and every other weekend.  At the time of Ray's divorce, his mother was not married, but she married Petitioner in 1999 or 2000.  (Tr. I at 229-30.)  Ray testified that Carlie sometimes went to his mother's house on the weekends that he had visitation.  (Tr. I at 230.)  She spent Saturday night with her grandmother and Petitioner, and then went to church with them on Sunday.  *(Id.)*  Carlie stayed with them more frequently in the summers.  (Tr. I at 230-31.)  Over the course of a year, Carlie spent the night with her grandmother and Petitioner about 15 to 16 times.  (Tr. I at 231.)  Ray believed that Carlie had a very good relationship with her grandmother.  Ray learned about the allegations against Petitioner on November 19.  *(Id.)*  A week later, Ray saw Petitioner at Carlie's dance recital.  (Tr. I at 232.)  Ray noticed that Petitioner, who normally was very social, seemed to be trying to avoid them.  (Tr. I at

233.)  At that time, Ray did not believe that Petitioner was not aware of the allegations against him. (Tr. I at 234.)  Ray testified that he never noticed any unusual behavior when he was dropping off or picking up Carlie from her grandmother's house.  (Tr. I at 236.)

Sarah Tighe, Petitioner's biological daughter, testified that Petitioner began touching her inappropriately when she was 11 or 12 years old.  (Tr. II at 18-19.)  On the first occasion, Petitioner called Sarah over to the couch in the living room where he was sitting.  (Tr. II at 20.) Sarah was wearing a bathing suit.  Petitioner asked her if she had started to get pubic hair.  He then asked to see, pulled down the bottom of her bathing suit, and began touching her vagina and vulva. (*Id.*)  He made her sit on his lap and continued to touch her.  Sarah testified that Petitioner picked her up and carried her to his bedroom.  (*Id.*)  He locked the door and then stood at the foot of the bed in his underwear with an erection.  (Tr. II at 20-21.)  Petitioner got into bed with her and continued to touch her.  He also made Sarah rub her clitoris with her right hand.  Petitioner held her hand in place, and if she tried to remove it, he put it back in place.  (Tr. II at 21.)  Petitioner continued to touch her with his other hand and then penetrated her with his fingers.  (*Id.*)  Sarah indicated that Petitioner touched her breasts a little bit, but mostly her vagina.  (*Id.*)

The next incident occurred while Sarah was in the bathtub.  (Tr. II at 22.)  Petitioner came in and started washing Sarah's back with a washcloth.  After that, he moved to her front and breasts and then down to her vaginal area.  (*Id.*)  Petitioner then penetrated her with his fingers.  (*Id.*) Sarah testified that Petitioner put his fingers in "pretty far" and that it hurt.  (Tr. II at 23.)  The third incident took place on the living room couch.  (Tr. II at 24.)  Petitioner called Sarah over and made her lay down in front of him on the couch.  After covering them with a blanket, he put his hand in her pants and penetrated her with his fingers.  (*Id.*)  All three of the incidents occurred over a four-

month span.  (Tr. II at 22.)  After the first incident, Petitioner told Sarah not to say anything, that it was just between them.  (Tr. II at 25.)  Sarah described other incidents where Petitioner hugged her too long, tried to French kiss her, and held her down and touched her breasts and inner thigh area while pretending to tickle her.  Sarah described Petitioner as very controlling and threatening.  (*Id*.) She did not recall any incidents where Petitioner came into her bedroom and sexually abused her while she was sleeping, but believed that she may have blocked it out.  (Tr. II at 27.)  As a result of Petitioner's abuse, Sarah suffered from post-traumatic stress disorder and had received mental health treatment for fifteen years.  (Tr. II at 25-26.)

Kimberly (Galbraith) Crouch, Petitioner's niece, testified that Petitioner began to have sexual contact with her when she was 8 or 9 years old, which was in 1974 or 1975.  (Tr. II at 29.)  When Kimberly spent the night at Petitioner's house, she woke up in the middle of the night as Petitioner was pulling down her underwear.  (Tr. II at 29-30.)  Petitioner touched the inside and outside of her vaginal area.  (Tr. II at 30.)  Kimberly could not recall how far Petitioner put his fingers inside her, but said that it hurt.  (Tr. II at 31.)  These incidents continued until Kimberly was 11 years old.  She estimated that Petitioner touched her vaginal area approximately 20 times.  (*Id*.) At some point during the span of time that Petitioner was sexually abusing her, he moved from Vandalia to a house across the street from her family in Niles.  (Tr. II at 32, 34.)  When Kimberly was 11, Petitioner also had sexual intercourse with her.  (Tr. II at 34.)  Petitioner tried to have sexual intercourse with her again when she was 12 or 13, but Petitioner ejaculated before he penetrated her with his penis.  (Tr. II at 35.)  Petitioner told her not to tell anyone during almost every incident. (Tr. II at 36.)  The last incident occurred when Kimberly was 13 or 14.  Kimberly was  home alone sleeping in her sister's bedroom, when Petitioner came in and tried to have intercourse with her.  (Tr.

II at 37-38.)  Kimberly fled to the bathroom and locked the door.  (Tr. II at 38.)  She phoned a friend and ultimately told the friend what had happened.  (Tr. II at 38-39.)  Kimberly told her mother about the abuse when she was 15 years old, which was in 1981.  (Tr. II at 42.)

Kimberly did not recall speaking to law enforcement officers about Petitioner in 1982, although she was aware that her sister made a complaint against him.  (Tr. II at 39.)  Kimberly testified that she first spoke to law enforcement about Petitioner's sexual abuse when a state trooper interviewed her 2 or 3 months before trial.  (Tr. II at 40.)  Kimberly testified that she had loved Petitioner. She had a poor home life as a girl and had wished that Petitioner and her aunt were her parents. (Tr. II at 48.)  Petitioner took her places, bought her things and said nice things to her.  (Tr. II at 48.)  She did not remember him doing those things with other relatives.  (Tr. II at 48-49.)

Stacie (Galbraith) Glavin, Kimberly Crouch's younger sister, testified that Petitioner touched her inappropriately in 1982, when she was 12 years old. (Tr. II at 51.)  At that time, Stacie's family lived across the street from Petitioner in Niles.  (Tr. II at 52.)  Stacie and her friend, Sarah, were spending the night at Petitioner's house and were sleeping in the same bed. (*Id*.)  Stacie woke up in the middle of night with someone standing over her.  Petitioner pulled down her underwear and was touching her vagina.  (Tr. II at 53.)  Stacie was frightened and told him to stop, which he did.  (*Id*.)  Stacie waited about ten minutes and then went back across the street to her house.  (Tr. II at 54.)  The police were contacted as a result of the incident.  (*Id*.)

Melanie Smith, Petitioner's ex-wife and Sarah Tighe's mother, testified that Sarah told her in 1986 or 1987 that Petitioner had sexually abused her.  (Tr. II at 58-59, 62.)  Sarah was 12 years old when she reported the abuse to Smith.  (Tr. II at 59.)  Smith confronted Petitioner, who said "[t]hat he was glad it was finally out; that he could get help; that he was trying to show her the

difference in good touching and bad touching." Petitioner admitted to touching Sarah's vagina on one occasion. (*Id*.) Smith separated from Petitioner as a result of the incident, although Petitioner later moved back in after a counselor indicated that it was safe. (Tr. II at 60, 65-66.) Smith and Petitioner divorced six years later. (Tr. II at 60.) Smith testified that after the incident involving Stacie in 1982, Petitioner told her "[t]hat he was in big trouble; that he had gone up to check on the girls and tried to take Stacie's panties off," but did not admit to touching Stacie. (Tr. II at 61.) Smith first informed the police about what had happened with Sarah after the divorce. (*Id*.)

Dr. James Henry testified that he was employed by Western Michigan University as an associate professor and director of the Southwest Michigan Children's Trauma Assessment Center. (Tr. II at 72.) Henry was qualified to testify as an expert in the area of child sexual abuse. (Tr. II at 74, 78.) Henry had not had contact with anyone involved in this case; rather, he was in court to testify generally about the behavior of children who have been sexually abused. (Tr. II at 80.) According to Henry, child victims of sexual abuse most often do not immediately disclose the abuse. (Tr. II at 80-81.) On average, children wait 2 to 3 years to report abuse by someone in their family. (Tr. II at 81, 100.) One reason for the delay are feelings of shame and powerlessness. (Tr. II at 81.) Children who have been sexually abused often have feelings for the perpetrator because the abuser does special things for the victim to develop a relationship and make the victim feel special. (Tr. II at 84.) Henry described grooming behaviors as those special responses that begin to blur the boundaries between an adult and a child. (Tr. II at 84-85.) A child who has a close relationship with the abuser and has gone through the grooming process is less likely to disclose the abuse. (Tr. II at 85.) According to Henry, it is not unusual for children's memories of traumatic events to blur together or for them to suppress traumatic memories. (Tr. II at 85-87.)

Henry further testified that it would not be surprising for a child who was sexually abused from the age of eight, to conceal the sexual abuse even after receiving education at school about good and bad touching.  (Tr. II at 89-90.)  It also would not be unusual for child who was sexually abused from age 8 to 12 to later accompany the perpetrator on a vacation in the presence of another adult.  (Tr. II at 91.)  Henry explained that children often feel that they are going to get in trouble if they disclose sexual abuse.  (Tr. II at 92.)  As children reach adolescence, they are more likely to disclose abuse due to their own personal development and the support of a peer group.  (Tr. II at 93.)  Henry explained that some children who are sexually abused can externalize and act out in a way that may draw attention to the problem, while other children will internalize and push down their emotions so that no one would notice a change in their behavior.  (Tr. II at 94.)  The longer the abuse lasts, the more likely the child is to suffer from substance abuse, depression and mental illness as an adult.  (Tr. II at 95.)

Henry testified that an abuser will groom the victim by singling him or her out for special attention and favors.  (Tr. II at 95.)  Grooming behaviors can include special gifts, special words or affection and doing other things that the abuser would not be doing for other children.  (Tr. II at 95-96.)  After the abuse begins, the grooming behavior typically continues and may even intensify in order to keep the abuse a secret.  (Tr. II at 96.)  When abusers are confronted with their conduct, they sometimes will blame the victim or accuse the victim initiating the sexual contact in order to minimize the abuser's responsibility.  (Tr. II at 96-97.)  Henry agreed that grooming-type behaviors could be completely normal if the person engaging in the behavior never intends to sexually abuse the child.  (Tr. II at 97-99, 105-06.)  Once an accusation of sexual abuse is made,

such behavior may be interpreted as grooming for the purpose of blurring sexual boundaries. Consequently, the truthfulness of the accusation is very important. (Tr. II at 104.)

Michigan State Police Trooper Chris Shoemaker testified that he was involved in an investigation of Petitioner that resulted in three charges of CSC I and three charges of CSC II. (Tr. II at 114.) All six counts allegedly took place at Petitioner's residence on Woodland Drive in Cass County. (Tr. II at 114.) Shoemaker testified that he interviewed Petitioner concerning the charges in this case on December 6, 2007. (Tr. II at 115.) Petitioner told Shoemaker that on one occasion about 20 years ago, when his daughter was 11 years old, she sat down next to him on the couch and put his hand down the front of her pants. (Tr. II at 115-16.) While Petitioner claimed that his daughter put his hand down her pants, he admitted that it was an inappropriate touching on his part. (Tr. II at 115.) At the time Petitioner disclosed the incident with his daughter, Shoemaker was not aware of any previous allegations of sexual misconduct against Petitioner. (Tr. II at 116.)

Debra Rene Wallace testified that she was married to Vicky Tighe's brother for 32 years. (Tr. II at 118.) Wallace testified that she and her husband, Vicky and Petitioner and a third couple from the family had dinner together at least one Saturday night per month from the winter of 2002 through the summer of 2003. (Tr. II at 119-20.) They took turns hosting the dinner at their homes. (*Id.*) Carlie was not there when they had dinner at the Tighe residence. (*Id.*)

Randy Tighe, Petitioner's younger brother, testified that he spent a lot of time at Petitioner's house in the late 1970s and early 1980s. (Tr. II at 122.) Randy knew Kim Galbraith from being at Petitioner's house. (Tr. II at 123.) He never noticed Kim acting strangely around Petitioner. (Tr. II at 123.) Randy could not recall any instances when Kim went into the house alone with Petitioner. (Tr. II at 124.)

Vicky Louise Tighe testified that she married Petitioner on July 16, 2001.  (Tr. II at 136.)  Carlie began staying at her house on Saturday nights in 1999.  (Tr. II at 137.)  For the first few years Carlie's brother, Josh, sometimes spent the night, too.  (Tr. II at 138.)  When Carlie stayed over on Saturday night, they always took her to church with them the next day to the First Christian Church in Dowagiac.  (Tr. II at 138-39.)  Each time they took Carlie to church, her name was included on the attendance form located in the pew.  (Tr. II at 139.)  Vicky testified that Carlie spent the night at her house about three times from the summer of 1999 through the summer of 2000, and four or five times from the summer of 2001 through the summer of 2002.  (Tr. II at 140.)  Carlie was never there when they had dinner parties with her brothers and their wives, which were held on Saturday nights once or twice a month in 2003.  (Tr. II at 141.)  With regard to 2004, Vicky testified that Carlie never stayed with them more than four times during any summer.  (*Id.*)  According to Vicky, Carlie stayed over night a total of twelve times between the summer of 1999 and 2005.  (Tr. II at 142, 156.)  Other than the times that Josh stayed, Vicky recalled one time when Carlie's stepsister stayed over with her.  (Tr. II at 143.)  Vicky never observed Carlie acting strangely or afraid around Petitioner.  (Tr. II at 143, 152.)

Vicky testified that Carlie slept in the bedroom across the hall from Vicky and Petitioner.  (Tr. II at 144.)  Vicky and Petitioner had the habit of closing their bedroom door at night.  (Tr. II at 147.)   The bedroom door stuck, so it made a lot of noise when it was opened or closed.  (Tr. II at 146.)  Vicky testified that she was a light sleeper and woke up when Petitioner got up to use the bathroom, which was attached to the bedroom.  (Tr. II at 147-48.)  Petitioner never opened the bedroom door, which would have woken her.  (Tr. II at 148.)  The defense introduced a video of Vicky opening and closing the bedroom door.  (Tr. II at 149-152.)

According to Vicky, Carlie last stayed with them in June of 2007.  Carlie spent the night and the next day she drove with Vicky and Petitioner to Kentucky to visit some family members.  (Tr. II at 153.)  The defense introduced photographs from the trip of Carlie and Petitioner together.  (Tr. II at 155.)  Vicky described Carlie as smiling and looking like she was having a good time in the photos.  (*Id*.)  Vicky testified that there were times that she would not allow Carlie to come stay due to concerns about head lice.  (Tr. II at 156.)  On cross-examination, Vicky testified that Carlie and Petitioner had a good relationship; she never saw Carlie get mad or upset with Petitioner.  (Tr. II at 158.)  When asked whether Carlie would have a reason to come to court and lie about the charges against him. Vicky responded, "I wouldn't think so."  (*Id*.)

Lilian Easton testified that she was a volunteer at the First Christian Church in Dowagiac, where Petitioner and his wife, Vicky Tighe, attended church.  (Tr II, 125.)  Attendees at church services are asked to fill out registry cards, which are located in the pews.  (Tr. II at 126.)  Defense counsel sought admission of the registry records for the period January 7, 2001 through December 19, 2004.  Easton testified that, at some point, she loaned the original records to Vicky Tighe.  (Tr. II at 130.)  The prosecutor objected to the admission of the records because they were copies with no explanation for the absence of the originals.  The trial court sustained the objection and Easton was excused.  (Tr. II at 135.)  Easton was later recalled and presented the original registry records from January 7, 2001 through December 2004.  (Tr. II at 163-64.)  Easton testified that she did not watch attendees fill out the cards.  They were given to her by someone else and she placed them in the records.  (Tr. II at 164-65.)

Petitioner testified that he had been married to Vicky Tighe since 2001.  (Tr. II at 166.)  He previously was married to Melony Smith from 1972 to 1993.  (*Id*.)  Vicky moved in with

Petitioner in the late summer or early fall of 1999. (Tr. II at 167.) Petitioner testified that Carlie did not spend the night at their house in 1999 or 2000, but might have stayed once or twice in 2001. (Tr. II at 168.) He estimated that Carlie stayed over night two or three times per year from 2002 to 2004. (Tr. II at 177.) Carlie spent the night on Saturday and they went to church on Sunday. (*Id.*) According to Petitioner, they signed the church log every Sunday. (*Id.*) If Carlie was with them, she usually signed the log herself. Otherwise, Petitioner or his wife put Carlie's name on the log. (Tr. II at 178.) Petitioner testified that he and his wife had the opportunity to go through the church log records from 2001 through 2007 and make copies of the log records that contained their names and Carlie's name. (Tr. II at 178.) The records showed that Carlie went to church with them 10 or 12 times during that period. (Tr. II at 180.) Petitioner indicated that there were times Carlie went to church with them when she had not spent the night with them. (Tr. II at 180-81.)

During his testimony, Petitioner admitted that he sexually molested his daughter, Sarah Tighe, in 1986 or 1987. (Tr. II at 168-70.) He agreed that Sarah's testimony regarding the details of the abuse was "basically" accurate. (Tr. II at 190-91.) Petitioner claimed that the first incident occurred after Sarah walked up to him while he was laying on the couch and put his hand down her pants. (Tr. II at 191.) After that, Petitioner admitted to initiating the contact. (Tr. II at 191-92.) Petitioner, however, denied that he ever had any sexual contact with Kim or Stacie Galbraith, or any other child. (Tr. II at 171-75, 188.) Petitioner could not recall being interviewed by Trooper Christy Van Patton in 1982 regarding the incident where Kim alleged that Petitioner came into her bedroom with an erection and tried to have sex with her. (Tr. II at 193-94.) Petitioner also could not recall telling Van Patton that the incident did happen, but Petitioner was just goofing around. (Tr. II at 194-96.) However, Petitioner clarified that the incident he admitted to police was

holding Kim down, not trying to molest her.  (Tr. II at 194.)  Petitioner also did not recall admitted

to police that he "window peeped" into Kim's house a few times.  (Tr. II at 197.)  With regard to the

alleged incident involving Stacie, Petitioner testified that he remembered going upstairs, re-covering

her, turning the light off and going back downstairs to bed.  Petitioner did not remember telling the

police in 1982 that he never went upstairs to the bedroom.  (*Id.*)

Petitioner denied that he ever touched Carlie inappropriately.  (Tr. II at 176, 184-85.)

He also denied ever being alone with Carlie in the bedroom where she slept at their house.  (Tr. II

at 182.)  Petitioner's bedroom door did not open properly such that it made a lot of noise whenever

the door was opened or closed.  (Id. at 183.)  Petitioner testified that he had some affection for Carlie

as a grandfather, but never bought her anything or took her anywhere by himself.  (Tr. II at 181-82.)

Carlie always acted normal around him until an incident that occurred at her dance school in

September or October of 2007.  (Tr. II at 186.)  They were walking down the hall toward the lost

and found looking for her dance shoe when Carlie turned around and said, "Get away from me, you

stalker."  (Tr. II at 187.)  Petitioner was stunned by Carlie's statement and had no idea where it came

from.  (*Id.*)  When Petitioner saw Carlie after that, she acted a little "shy" or "skittish."  (Tr. II at

188.)

The prosecutor called several rebuttal witnesses beginning with Michigan State

Trooper Gregory O'Toole.  O'Toole testified that in 1982, he and Trooper Van Patton investigated

a sexual misconduct complaint involving Petitioner.  (Tr. III at 6.)  The initial complaint concerned

Stacie Galbraith, but O'Toole also interviewed Kim Galbraith.  After interviewing Kim Galbreath,

O'Toole spoke to Petitioner about her allegations that Petitioner entered her bedroom and attempted

to pull off her pajama bottoms and panties, which resulted in a struggle and Kim ultimately locking

herself in the bathroom.  (Tr. III at 7.)  According to O'Toole, Petitioner validated everything that Kim had reported, "but he felt that he had a problem at the time, and he had dealt with it himself and taken care of it."  (Tr. III at 8.)  Petitioner also stated that he was just fooling around with Kim and did not intend to do anything beyond that.  (*Id.*)  Petitioner also admitted that he had been peeping in the windows at Kim and Stacie's house, but promised to stop.  (Tr. III at 9.)  With regard to Stacie's allegations, Petitioner maintained that he had not gone upstairs at all.  (Tr. III at 10.)

Sarah Tighe testified on rebuttal that she never took her father's hand and put it down her pants.  (Tr. III at 14.)

Kenneth Ray testified that when the allegations against Petitioner first came out, his mother's biggest concern was that she would be homeless if he went to prison.  (Tr. III at 15.)  Ray estimated that Carlie spent the night with his mother and Petitioner about ten times per year from 2001 to 2006.  (Tr. III at 17.)  Carlie spent the night with them more often in the summer.  (Tr. III at 18.)  Ray was not aware that Petitioner had sexually abused his daughter before the accusation made by Carlie.  (Tr. III at 18-19.)  Ray recalled about a one-year period when Carlie had to be treated for head lice several times.  (Tr. III at 15-16.)  On at least one occasion, Ray's mother helped to treat Carlie at her house with medicated shampoo.  (Tr. III at 16-17.)  After that incident, Ray checked Carlie for lice before she went over to his mother's house.  (Tr. III at 17.)  Ray could not specifically recall how many times Carlie having lice interrupted her visits to her grandmother's house, but thought it was only one time.  (*Id.*)

Carlie Ray testified on rebuttal that she had a problem with head lice over about a one-year period when she was in the fourth or fifth grade.  (Tr. III at 20.)  Carlie remembered one occasion when her grandmother treated her for lice at her house.  (Tr. III at 21.)  Carlie was never

told that she could not go over to her grandmother's house because she had lice. (Tr. III at 21, 23.)
Petitioner and her grandmother helped to pay for her dance classes. (Tr. III at 21-22.) Carlie denied
saying, "Get away from me, stalker" to Petitioner while they were at the dance studio. (Tr. III at
22.)           At the conclusion of trial, on July 31, 2008, the jury found Petitioner guilty of three
counts of CSC I and three counts of CSC II. On August 29, 2008, the trial court sentenced
Petitioner to imprisonment of 20 to 40 years for each of the CSC I convictions and 7 to 15 years for
each of the CSC II convictions. (Sentencing Transcript at 42, ECF No. 30.)

## II.      Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which
was filed by counsel on May 14, 2009, raised the first five issues presented in this application for
habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, ECF No. 33.) Petitioner filed a *pro per*
"Standard 4" brief raising six additional issues, which are presented as Grounds VI through XI of
the instant petition. By unpublished opinion issued on May 4, 2010, the Michigan Court of Appeals
rejected all appellate arguments and affirmed Petitioner's convictions and sentences. *See People
v. Tighe*, No. 287731, 2010 WL 1779905 (Mich. Ct. App. May 4, 2010).

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme
Court. Petitioner raised the same eleven claims raised before and rejected by the Michigan Court
of Appeals, together with four new claims, which now are presented as Grounds XII through XV.
By order entered June 28, 2011, the Michigan Supreme Court denied his application for leave to
appeal because it was not persuaded that the questions presented should be reviewed. *See People
v. Tighe*, 798 N.W.2d 769 (Mich. 2011). The supreme court subsequently denied Petitioner's motion
for reconsideration on September 26, 2011. *See People v. Tighe*, 803 N.W.2d 320 (Mich. 2011).

### III.     Post-conviction relief

On December 2, 2011, Petitioner filed a motion for relief from judgment in the Cass County Circuit Court raising four new claims of error, which are presented as Grounds XVI through XIX of this petition.  Petitioner's motion was summarily denied without explanation on the date it was filed.  Petitioner sought leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court.  Both courts denied leave to appeal under M.C.R. 6.508(D), on March 12, 2012 and September 24, 2012, respectively.  (*See* 3/12/12 Mich. Ct. App. Ord., ECF No. 35; 9/25/12 Mich. Ord. ECF No. 36.)

### <u>Standard of Review</u>

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271

F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 83, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).  The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular . . . case." *Williams*, 529 U.S. at 407.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously

or incorrectly." *Id.* at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706-07 (quoting *Harrington*, 562 U.S. at 103).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.     Procedural Default:  Grounds XII-XV

Petitioner raised Grounds XII-XV for the first time in his application for leave to appeal to the Michigan Supreme Court during his direct appeal. Petitioner did not raise the claims on direct appeal in the Michigan Court of Appeals, nor did he raise them in his subsequent motion for relief from judgment. Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365-66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

In this case, Petitioner presented Grounds XII-XV only in the Michigan Supreme Court.  Presentation of an issue for the first time on discretionary review to the state supreme court does not fulfill the requirement of "fair presentation." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Applying *Castille*, the Sixth Circuit repeatedly has recognized that a habeas petitioner does not comply with the exhaustion requirement when he fails to raise a claim in the state court of appeals, but raises it for the first time on discretionary appeal to the state's highest court.  *See Skinner v. McLemore*, 425 F. App'x 491, 494 (6th Cir. 2011); *Thompson v. Bell*, 580 F.3d 423, 438 (6th Cir. 2009); *Warlick v. Romanowski*, 367 F. App'x 634, 643 (6th Cir. 2010); *Granger v. Hurt*, 215 F. App'x 485, 491 (6th Cir. 2007); *Dunbar v. Pitcher*, No. 98-2068, 2000 WL 179026, at *1 (6th Cir. Feb. 9, 2000); *Miller v. Parker*, No. 99-5007, 1999 WL 1282436, at *2 (6th Cir. Dec. 27, 1999); *Troutman v. Turner*, No. 95-3597, 1995 WL 728182, at *2 (6th Cir. Dec. 7, 1995).  Unless the state supreme court actually grants leave to appeal and reviews the issue, it remains unexhausted in the state courts.  Petitioner's application for leave to appeal was denied, and, thus, the issue was not reviewed.

An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c).  However, exhaustion only is required if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred." *Id.*; *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991), *rev'd on other grounds*, 535 U.S. 635 (2002)).

Under Michigan law, a defendant may file one motion for relief from judgment under M.C.R. 6.500 *et. seq.* *See* M.C.R. 6.502(G)(1). Petitioner already has filed his one allotted motion. He therefore has no available remedy. At this juncture, the Court must consider whether there is cause and prejudice to excuse Petitioner's failure to properly present the claims in state court. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust*, 17 F.3d at 160. To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). A petitioner who fails to demonstrate cause and prejudice cannot have a cognizable claim. *Gray*, 518 U.S. at 162. Further, where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner cannot show cause for his failure to properly exhaust the claims presented in Grounds XII-XV. Petitioner filed a *pro se* Standard 4 brief on direct appeal in the Michigan Court of Appeals in which he presented numerous claims of error, but did not include the four claims now presented in Grounds XII-XV. Furthermore, Petitioner could have exhausted the claims by raising them in his motion for relief from judgment and appealing them to each level of the Michigan appellate courts. A petitioner's *pro se* status or ignorance of his rights does not constitute cause. *See Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004); *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995). Because petitioner fails to show cause, the Court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43. Consequently Grounds XII-XV are procedurally defaulted and may not be considered by the Court.

II.         **Sufficiency of Information and Joinder of Offenses:  Ground I**

In his first ground for habeas corpus relief, Petitioner contends that his due process rights were violated due to the six-year time span covered by the information and the lack of specificity as to when the alleges offenses took place.  Petitioner further claims that his due process right were violated when the six charges were tried together, rather than severed into six separate cases.

The Michigan Court of Appeals found the issues to be unpreserved, but applying a plain error analysis, concluded that Petitioner failed to establish error affecting his substantial rights. The court stated:

> On appeal, defendant first challenges the lack of specificity in the information.  Defendant also claims that he was entitled to a bill of particulars, entitled to severance of the six charges against him, and deprived of due process. Defendant did not object to or move to amend the information before trial, made no request for a bill of particulars, failed to move to sever the charges, and raised no due process challenges below.  Thus, these issues are not preserved. MCL 767.76; *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994).  Unpreserved allegations of error are subject to plain-error analysis.  *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).
>
> Generally, a criminal indictment or information must contain the following:
>
> (a)  The nature of the offense stated in language which will fairly apprise the accused and the court of the offense charged.
>
> (b)  The time of the offense as near as may be.  No variance as to time shall be fatal unless time is of the essence of the offense.
>
> (c)  That the offense was committed in the county or within the jurisdiction of the court.  [MCL 767.45(1).]
>
> Defendant was charged with three counts of CSC-1 involving digital/vaginal penetration with a person less than 13 years of age, and three counts of CSC-2 involving sexual contact with a person less than 13 years of age. The offenses were alleged to have occurred between 2001 and 2006.  At the preliminary examination, the victim testified that the sexual assaults began when she was eight or nine years old, and that there were more than ten instances of sexual contact and two or three

instances of sexual penetration. She testified that the sexual assaults happened over the course of three or four summers, and the last one occurred when she was 11 or 12 years old (in 2004 or 2005). The preliminary examination narrowed the date of offenses by one year. The prosecution was under no obligation to pinpoint specific dates for the offenses, because "[t]ime is not of the essence, nor is it a material element, in criminal sexual conduct cases involving a child victim." *People v Dobek*, 274 Mich App 58, 83; 732 NW2d 546 (2007). On appeal, defendant nevertheless claims that the lack of specificity prevented him from asserting an alibi defense. However, "an alibi defense does not make time of the essence." *Id*. Moreover, we are disinclined to hold that an information was deficient for failing to pinpoint a specific date "[w]here the facts demonstrate that the prosecutor has stated the date and time of the offense to the best of his or her knowledge after undertaking a reasonably thorough investigation . . . ." *People v Naugle*, 152 Mich App 227, 234; 393 NW2d 592 (1986). Further, due process was not offended because defendant had reasonable notice of the charges against him and an opportunity to present a defense. *See People v Darden*, 230 Mich App 597, 600; 585 NW2d 27 (1998). We conclude that reversal is not warranted because defendant was not prejudiced in his defense, and a failure of justice did not result in this case. MCL 767.76.

Defendant further claims that he was entitled to a bill of particulars. Under MCR 6.112(E), the trial court may, on motion, order the prosecutor to provide a bill of particulars. However, defendant's need for a bill of particulars was unnecessary because the preliminary examination adequately informed him of the charges against him. *People v Harbour*, 76 Mich App 552, 557; 257 NW2d 165 (1977).

We also conclude that defendant was not entitled to severance of the charges below pursuant to MCR 6.120(C) ("On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)."). The charges all stem from the same conduct, i.e., defendant's sexual assaults of his step-granddaughter, and such conduct demonstrated a single scheme or plan. MCR 6.120(B)(1)(a) and (c). Defendant failed to establish plain error affecting his substantial rights.[2] *Carines*, 460 Mich at 763-764.

> [2] Because defendant is not entitled to a bill of particulars and because the trial court's decision not to sever the charges was proper, any motion to address these issues would be meritless. Defense counsel is not ineffective for failing to bring a meritless motion. *People v Cline*, 276 Mich App 634, 641-642; 741 NW2d 563 (2007).

*Tighe*, 2010 WL 1779905 at *2-3.

Respondent contends that Petitioner's claims are procedurally defaulted because he failed to preserve them in the trial court. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings,

as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

The Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to provide him an adequate opportunity to prepare his defense.  *See*, *e.g.*, *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977).  This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. *Combs v. State of Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976).  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial.  *Id*.  "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d

557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira*, 806 F.2d at 639. In other words, as long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process Clause is satisfied. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984); *Watson*, 558 F.2d at 338.

In this case, the indictment stated that the charged offenses occurred during a six-year period between January of 2001 and December of 2006. As noted by the Michigan Court of Appeals, the victim's preliminary examination testimony narrowed the time frame by one year. The prosecutor pinpointed the time of the offenses to the best of his ability given the age of the victim and the nature of the crimes. The Sixth Circuit has specifically held that "fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements." *Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005). The court repeated the same proposition recently in affirming the denial of habeas relief in a Michigan case involving a constitutional challenge to the notice given by the charging information in a child sexual abuse prosecution. *See Stevenson v. Scutt*, 531 F. App'x 576, 580 (6th Cir. 2013) (citing *Valentine*). Therefore, this Court cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of clearly established Supreme Court precedent.[2]

To the extent Petitioner asserts that the trial court violated Michigan law by failing to sever the charges into six separate trials, his claim is not cognizable for purposes of habeas corpus review. Improper joinder does not, by itself, violate the federal constitution. *United States v. Lane*,

---

[2] Any other deficiencies in the indictment alleged by Petitioner are solely matters of state law and, accordingly, are not cognizable in a federal habeas proceeding. *Mira*, 806 F.2s at 639; *Combs*, 530 F.2d at 699.

474 U.S. 438, 446, n. 8 (1986). The Supreme Court in *Lane* suggested in passing that misjoinder could rise "to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id.* The Sixth Circuit noted that the language in *Lane* concerning a court's failure to sever criminal charges is simply dicta and thus not clearly established federal law. *See Mayfield v. Morrow*, 528 F. App'x 538, 541–42 (6th Cir. 2013). Because "'clearly established Federal law' for purposes of § 2254(d)(1) refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions [.],'" *Id.* (quoting *Williams*, 529 U.S. at 412), the Sixth Circuit concluded that the petitioner could not rely on *Lane* to obtain habeas relief on his claim that he had been deprived of his right to a fair trial when the judge denied his motion to sever different rape charges. *Id.* Accordingly, the Michigan Court of Appeals' rejection of Petitioner's improper joinder claim was not an unreasonable application of clearly established federal law.

### III.   **Evidentiary Errors: Ground II**

In his second ground for habeas corpus relief, Petitioner asserts various errors committed by the trial court that deprived him of a fair trial.

#### A.   Admission of Bad Acts Evidence

Petitioner first claims that the trial court committed error by allowing the testimony of his daughter, Sarah Tighe and his nieces, Kimberly (Galbraith) Crouch and Stacie (Galbraith) Glavin, regarding sexual abuse that occurred when they were girls.

The Michigan Court of Appeals found no error in the admission of the evidence, stating:

> Defendant claims that the trial court erroneously admitted improper other-acts evidence concerning alleged sexual assaults that defendant committed against his nieces and daughter.  Such evidence was admissible pursuant to MCL 768.27a,

which states, in pertinent part, "[I]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." "MCL 768.27a allows prosecutors to introduce evidence of a defendant's uncharged sexual offenses against minors without having to justify their admissibility under MRE 404(b)."[3] *People v Pattison*, 276 Mich App 613, 618-619; 741 NW2d 558 (2007). Accordingly, it is a substantive rule of evidence. *Id*. at 619. In this case, the prosecution introduced evidence of defendant's past sexual assaults of his biological daughter and two nieces related by a previous marriage. The first niece testified regarding various sexual assaults by defendant beginning when she was eight years old (in 1974 or 1975) and continuing until she was 14 years old. Another niece testified that defendant sexually assaulted her in 1982. Defendant's daughter testified that defendant began touching her in inappropriate ways when she was six or seven years old, and that he digitally penetrated her vagina when she was 11 or 12 years old. Defendant's conduct against these witnesses was generally proscribed by MCL 750.520b(1)(a) (sexual penetration of an individual who was less than 13 years of age) and MCL 750.520c(1)(a) (sexual contact with an individual less than 13 years of age), which are listed offenses. MCL 28.722(e)(x); MCL 768.27a(2)(a). The trial court did not err in admitting the challenged testimonial evidence, because in cases involving the sexual abuse of minors, MCL 768.27a permits the admission of evidence that the defendant committed other listed offenses against a minor for consideration with regard to any relevant matter, including demonstrating the likelihood that defendant would engage in criminal sexual behavior toward the victim. *See Pattison*, 276 Mich App at 620.

The evidence is obviously relevant, MRE 401, because defendant's past activity of molesting prepubescent girls makes it more probable that he molested the victim in this case. We are also satisfied that the trial court took seriously its responsibility to weigh the probative value of the evidence against its undue prejudicial effect, MRE 403, before admitting the evidence. *Id*. at 621. Evidence of uncharged sexual offenses against the witnesses was an essential component of the case presented by the prosecution. But almost all evidence of previous behavior has some prejudicial effect, *People v Albers*, 258 Mich App 578, 591; 672 NW2d 336 (2003), and there was no danger that marginally probative evidence would be given undue weight by the juror or that the jury was confused or misled. The evidence did not cause undue delay, nor was it a waste of time. In sum, MRE 403 did not require the denial of the admission of evidence.

[3] MRE 404(b)(1) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible for other purposes.

*Tighe*, 2010 WL 1779905 at *3-4.

As previously discussed, the extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  Petitioner cannot meet this difficult standard as there is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, 502 U.S. at 75, the Supreme Court declined to hold that the admission of prior acts evidence violates due process.  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether

a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Because there was no constitutional violation in the admission of evidence (bad acts), the state court decision was "far from" an unreasonable determination of the facts in light of the evidence presented. *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.

### B.    Admission of Expert Testimony

Petitioner contends that the trial court erred by allowing the testimony of a child CSC expert. Petitioner argues that the expert's testimony went beyond the limits imposed by Michigan law for such experts. The Michigan Court of Appeals disagreed, stating:

> Next, defendant argues that the trial court admitted improper expert testimony when it permitted Dr. James Henry to testify as an expert in child sexual abuse. The prosecution questioned Dr. Henry regarding his background, defense counsel conducted voir dire regarding his qualifications, and the trial court was satisfied regarding his qualifications. See MRE 104(a); MRE 702. In child sexual abuse cases, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). However, in CSC cases involving children,
>
> > an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and . . . may testify with regard to the consistencies between the behavior of the particular victim and other victims of

-34-

child sexual abuse to rebut an attack on the victim's credibility. [*Id*. at 352-353.]

We conclude that the expert's testimony did not violate any of the foregoing principles. On appeal, defendant fails to cite any specific testimony by Dr. Henry that runs afoul of *Peterson*. Notably, the record demonstrates that Dr. Henry's testimony amounted to a general explanation of "the common post-incident behavior of children who are victims of sexual abuse." *Id*. at 373. Dr. Henry did not testify that the victim's behavior was consistent with that of a sexually abused child, and we find no error related to Dr. Henry's testimony. Further, "[t]he prosecution may, in commenting on the evidence adduced at trial, argue the reasonable inferences drawn from the expert's testimony and compare the expert testimony to the facts of the case." *Id*. at 373. Dr. Henry's testimony was proper, the use of the testimony was proper, and the admission of such testimony was not an abuse of discretion. Additionally, we reject defendant's related claim of ineffective assistance of counsel, because defense counsel is not obligated to make a futile objection. *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002).

*Tighe*, 2010 WL 1779905 at *4.

As set forth above, state-court evidentiary rulings cannot rise to the level of due process violations unless they deprive the petitioner of a fundamentally fair trial. *Seymour*, 224 F.3d at 552. It is undisputed that Dr. Henry was qualified to testify as an expert on child sexual abuse. Dr. Henry did not have any contact with the victim and did not provide any specific testimony concerning the sexual abuse alleged in this case. Rather, Henry testified generally about the behavior of children who have been sexually abused. For example, Henry testified regarding why child victims of sexual abuse often do not immediately disclose the abuse. Such testimony was offered to rebut the defense attack on the victim's credibility for not disclosing the abuse for a period of years. As thoroughly discussed by the Michigan Court of Appeals, Dr. Henry's testimony was within the boundaries set by Michigan law. Consequently, this Court cannot find that Dr. Henry's testimony rendered Petitioner's trial fundamentally unfair.

### C.   Admission of Hearsay/Prior Consistent Statements

Petitioner contends that the trial court allowed prior consistent statements to improperly bolster the victim's story when the victim testified that she told her brother about the alleged sexual abuse on "My Space" (Tr. I at 164-67), and when the victim's mother and brother testified that the victim told them about being sexually abused.  (Tr. I at 214-16; 221-22.)  Petitioner further asserted that the statements by the victim's mother and brother were improper hearsay statements.  The Michigan Court of Appeals held that Petitioner's cursory treatment of this issue constituted abandonment on appeal.  *Tighe*, 2010 WL 1779905 at *5 (citing *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001)).  The court of appeals continued:

> The mere fact that one witness discussed statements that the victim had made to him does not automatically mean that another witness's testimony concerning a conversation with the victim cannot be admitted. Defendant failed to establish that the prosecutor introduced the challenged testimony solely to establish that the victim made consistent statements, and not for any other reason, and he does not otherwise explain how the challenged statements constitute hearsay.

*Tighe*, 2010 WL 1779905 at *5.

In denying Petitioner's claim, the Michigan Court of Appeals expressly relied on its rule requiring that, in order to obtain consideration of a claim on appeal, an appellant may not merely state that claim in his appellate brief.  Unless an appellant provides facts, citations, and arguments in support of the claim, it will be deemed abandoned. *People v. Coy*, 669 N.W.2d 831, 843 (Mich. Ct. App. 2003).  It is clear that the rule requiring development of appellate issues was well-established at the time of Petitioner's trial.  *See, e.g.*, MICH. CT. R. 7.212(C)(6)-(7) (setting forth requirements for appellate briefs, including the requirements of sufficient factual descriptions to understand the controversy and question involved and for arguments including supporting authorities); *Coy*, 669 N.W.2d at 843; *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App.

1995); *Froling v. Carpenter*, 512 N.W.2d 6, 9 (Mich. Ct. App. 1993).  Petitioner's failure to comply

with the state's independent and adequate state procedural rule, *i.e.*, developing his issue on appeal,

caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977);

*Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir.

2010).

   However, as set forth above, when the underlying claim is clearly meritless, the Court

may assume without deciding that there was no procedural default by Petitioner and decide the

merits of the case."  *See Binder*, 198 F.3d at 178.  Petitioner has failed to establish that the

complained of testimony was in any way improper, let alone that it denied him a fundamentally fair

trial.  *See Seymour,* 224 F.3d at 552.

   D. <u>Admission of Rebuttal Evidence</u>

   Petitioner further claims that the trial court allowed improper rebuttal testimony by

Michigan State Trooper Gregory O'Toole.  The Michigan Court of Appeals found that the evidence

was properly admitted, stating:

> Defendant alleges that Trooper Gregory O'Toole's rebuttal testimony was
> improperly admitted to impeach defendant. Generally, rebuttal evidence is
> admissible to explain, contradict, dispute, or otherwise refute an opponent's
> evidence. *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996). At trial,
> defendant denied the victim's sexual assault allegations. He also denied the sexual
> assault allegations made by his nieces. During cross-examination, he claimed that he
> could not recall what he told the police during the 1982 investigation of his second
> niece's sexual assault allegations. Trooper O'Toole testified as a rebuttal witness
> regarding defendant's statements during that investigation. "[A] party may introduce
> rebuttal evidence to contradict the answers elicited from a witness on
> cross-examination regarding matters germane to the issue if the rebuttal evidence is
> narrowly focused on refuting the witness' statements." *People v Spanke*, 254 Mich
> App 642, 644-645; 658 NW2d 504 (2003). The challenged evidence is proper
> because it was properly focused on refuting defendant's testimony.

*Tighe*, 2010 WL 177905, at *5.

As discussed by the Michigan Court of Appeals, Trooper O'Toole's testimony was properly offered to rebut Petitioner's testimony concerning the 1982 investigation of his niece's sexual assault allegations. Once again, Petitioner fails to establish that the complained of testimony was improper or that it deprived him of a fair trial.

### E.   Denial of Motions

Petitioner also argues that the trial court improperly denied his post-trial motions for resentencing and for a new trial. Because Petitioner provided only cursory treatment of these claims of error on appeal, the Michigan Court of Appeals deemed the claims abandoned. *See Tighe*, 2010 WL 177905, at *5. As a result, Petitioner's claim is procedurally defaulted for purposes of habeas corpus review. Regardless, Petitioner's claim requires little discussion as Petitioner fails to allege how the trial court's denial of his motions violated his federal rights. Petitioner, therefore, cannot establish entitlement to habeas corpus relief .

### IV.   **Sufficiency of the Evidence: Ground VI**

Petitioner contends that his convictions should be overturned because there was insufficient credible evidence to establish his guilt. In support of his claim, Petitioner contends that the victim's story was internally inconsistent, lacked detail and was inconsistent with other evidence presented in the case. Petitioner further argues that there was insufficient evidence of identity, insufficient evidence of penetration for purposes of the CSC I convictions and insufficient evidence of sexual purpose for purposes of the CSC II convictions.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The Michigan Court of Appeals rejected Petitioner's claim of insufficient evidence, stating:

> Defendant was convicted of three counts each of CSC-1 and CSC-2 for engaging in sexual penetrations and sexual contacts with the victim, who was under 13 years of age. MICH. COMP. LAWS § 750.520b(1)(a); MCL 750.520c(1)(a). MCL 750.520a(r) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(q) defines "sexual contact" as

-39-

the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose . . . .

Identity is an element of every offense, *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008), and "may be shown by either direct testimony or circumstantial evidence." *People v Kern*, 6 Mich App 406, 409; 149 NW2d 216 (1967).

A victim's uncorroborated testimony is sufficient to sustain a CSC conviction. Mich. Comp. Laws § 750.520h; *People v Lemmon*, 456 Mich 625, 632 n 6; 576 NW2d 129 (1998). The victim's testimony established defendant's identity as the perpetrator, contrary to defendant's strained argument. We defer to the jury's credibility decisions regarding witness identification testimony. *People v Edwards*, 55 Mich App 256, 259-260; 222 NW2d 203 (1974). The victim testified that defendant sexually assaulted her from the time she was eight years old until she was 12 years old. Defendant touched her vagina numerous times during that period. A reasonable inference can be made that this was done for a sexual purpose, especially in light of the testimony of defendant's daughter and two nieces. Further, the victim testified that defendant digitally penetrated her vagina on three or four separate occasions, and her testimony demonstrated that there was an intrusion by a part of defendant's body into her genital opening. We reject defendant's arguments related to the victim's credibility because "[t]he credibility of witnesses and the weight accorded to evidence are questions for the jury, and any conflict in the evidence must be resolved in the prosecutor's favor." *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact found that the essential elements of three counts each of CSC-1 and CSC-2 were proven beyond a reasonable doubt. MCL 750.520b(1)(a); MCL 750.520c(1)(a); *McGhee*, 268 Mich App at 622.

*Tighe*, 2010 WL 1779905 at *6.

As discussed by the court of appeals, the victim's testimony in this case was more than adequate to sustain Petitioner's convictions. With regard to the issue of identity, Carlie testified that Petitioner touched her vagina 50 to 100 times from the time she was 8 or 9 years old until she was 12 years old. (Tr. I at 149, 160, 190.) Carlie testified that there were times when her eyes were open and other times when she kept them closed, but she remembered seeing and feeling what happened to her. (Tr. I at 187, 199-202.) Construing the evidence in the light most favorable to the

prosecution, the jury could reasonable conclude that Petitioner was the person who committed the offenses.  Likewise, the victim testified that Petitioner put his finger in her vagina on three or four occasions (Tr. I, 159-60), which constituted sufficient evidence of penetration for purposes of the CSC I convictions.  Furthermore, as Petitioner has not offered any other credible reason for touching the victim's vagina on 50 to 100 occasions, it was entirely reasonable for the jury to infer that he was touching her for sexual gratification for purposes of the CSC II convictions.

Petitioner essentially argues that the victim's testimony was not credible.  "[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  A reviewing court "do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)).  Rather, the Court must defer to the jury's resolution of the conflicts in the evidence in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Moreover, in Michigan, "[t]he testimony of a victim need not be corroborated."  MICH. COMP. LAWS § 750.520h.  Therefore, the decision of the Michigan Court of Appeals was not based upon an unreasonable determination of the facts in light of the evidence presented at trial, nor was it an unreasonable application of *Jackson*.

## V.    **Prosecutorial Misconduct: Grounds VII and XVII**

Petitioner raises several instances of alleged prosecutorial misconduct in Grounds VII and XVII.  In Ground VII, Petitioner contends that the prosecutor elicited improper testimony, appealed to the jurors' sympathy, argued facts not in evidence and presented improper rebuttal

testimony.  He further argues in Ground XVII that the prosecutor destroyed exculpatory evidence and failed to have the state administer a polygraph.[3]

> A.   <u>Ground VII</u>

>> 1.   *Procedural Default*

With regard to the claims of prosecutorial misconduct presented in Ground VII, the Michigan Court of Appeals found these claims unpreserved because Petitioner did not raise objections at trial.  The court of appeals reviewed the claims only for plain error, stating:

> After thoroughly reviewing the entire record and the specific claims of misconduct, we find that defendant has failed to establish plain error affecting his substantial rights on each and every claim of prosecutorial misconduct.  *Carines*, 460 Mich at 763-764.  Therefore, reversal is not necessary with regard to this issue.

*Tighe*, 2010 WL 1779905 at *6.  The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright*, 433 U.S. at 86-88.  Even when the state court reviews the issue under a plain error or manifest injustice standard, Petitioner's failure to object is still considered a procedural default.  *See Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (citing *Harris*, 489 U.S. at 264 n.10).  However, because the procedural

---

[3] Petitioner also raises a claim of prosecutorial misconduct in Ground XIII.  However, as set forth in Part I of the Discussion, that claim is procedurally defaulted, and, thus, will not be addressed by the Court.

default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).  For the reasons set forth below, the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

2.     *Elicited Irrelevant and Prejudicial Testimony*

Petitioner claims that, on several occasions, the prosecutor elicited testimony from witnesses that was irrelevant and unduly prejudicial in violation of the Michigan Rules of Evidence. Examples cited by Petitioner include testimony regarding the "window peeping incident," how

Petitioner's alleged actions made the victim feel, Petitioner's reaction after the victim made her allegations and the fact that Petitioner's biological daughter was in counseling as a result of the sexual abuse.   As previously discussed, alleged violations of state rules of evidence are not cognizable for purposes of habeas corpus relief.  *See Estelle*, 502 U.S. at 62.  The examples cited by Petitioner were neither pervasive nor flagrant.  Moreover, the complained-of evidence was minor when weighed against the overall proof establishing guilt and clearly did not result in a fundamentally unfair trial.

### 3.   *Appealed to Jurors' Sympathy*

Petitioner further argues that the prosecutor improperly appealed to the juror's sympathy by asking the victim how Petitioner's alleged actions made her feel and eliciting testimony that Petitioner's  biological daughter was in counseling as a result of the sexual abuse.  However, this evidence was not so inflammatory as to constitute a denial of due process.  The cases in which the Sixth Circuit has found prejudicial misconduct have involved much more egregious and pervasive attempts to evoke sympathy.  For example, in *United States v. Payne*, 2 F.3d 706, 711-15 (6th Cir. 1993), the Court of Appeals  reversed a federal conviction because of the prosecutor's repeated references to Christmas time, poor pregnant women, and employee layoffs, finding that the prosecutor's statements were part of a "calculated effort to evoke strong sympathetic emotions" for victims and against the defendants.  Similarly, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the Court of Appeals condemned the prosecutor's repeated references to the defendant as a "Hitler," a "dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear." *Martin*, 11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot require reversal).

In this case, the prosecutor elicited brief testimony from the victim and Petitioner's biological daughter regarding the emotional impact of the sexual abuse.  It is not improper for the prosecutor to inquire regarding the emotional or psychological impact of the accused's conduct.  Such evidence is both relevant to the offense and the scoring of the sentencing guidelines.  Moreover, as the Sixth Circuit has observed, it is impossible to expect that a criminal trial will be conducted without some showing of feeling.  "'The stakes are high, and the participants are inevitably charged with emotion.'" *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (quoting *United States v. Wexler*, 79 F.2d 526, 529-530 (2d Cir. 1935)).  Given the circumstances, the complained-of evidence did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

### 4.   *Argued Facts not in Evidence*

Petitioner contends that the prosecutor argued facts not in evidence when, during his opening statements, he told the jury that the inconsistencies in the victim's story were because, according to the experts, children think differently than adults.  The prosecutor stated:

> Now Mr. Ronning is a very excellent lawyer, and he's going to be talking to the victim in this case, and he's going to be pointing out certain differences or inconsistencies in her testimony.  What the evidence is going to show you, what the expert's [sic] are going to tell you is that a child's brain, and based on your on experience you should know that a child's didn't work the same as an adult brain.  They don't remember facts the same way, they don't recall facts the same way.  They're much more literal when you ask them a question, and the experts will explain to you that if there is [sic] some inconsistencies in some secondary facts, not the actual facts, that is because a child thinks differently than an adult.

(Tr. I at 127-28.)  Petitioner further argues that the prosecutor argued facts not in evidence when he stated during opening arguments that the digital penetration occurred four to five times, when the victim testified that it happened only three to four times.  (Tr. I at 130, 192.)

During his opening statement, the prosecutor told the jury what evidence he expected to present at trial.  Prosecutor's are allowed to make reasonable inferences from the evidence.  *Bates v. Bell*, 402 F.3d 635, 646 (2005).  The prosecutor's comments regarding a child's brain were consistent with Dr. Henry's testimony that memories of repeated traumatic experiences are stored differently in a child's brain and can get blurred or confused over a long period of time.  (Tr. II at 85-86.)  To the extent the prosecutor misspoke when he stated that the digital penetration occurred four or five times, the jury later heard the victim's testimony that it occurred three or four times. (Tr. I 159-60.)  Moreover, Petitioner was charged and convicted of three counts of CSC I; therefore, he cannot show that he was prejudiced by the prosecutor's isolated statement.  In addition, the trial court instructed the jury that the attorneys' statements and arguments were not evidence.  (Tr. III at 54.)  Petitioner, therefore, was not denied a fair trial as a result of the prosecutor's comments.

5.    *Improper Rebuttal Testimony*

Petition asserts that the prosecutor improperly impeached him on a collateral matter when he recalled Sarah Tighe, Petitioner's biological daughter, to rebut Petitioner's trial testimony that she put his hand down the front of her pants.  During his testimony, Petitioner admitted to sexually molesting Sarah in 1986 or 1987.  (Tr. II at 168-70.)  He agreed that Sarah's testimony regarding the details of the abuse was "basically" accurate.  (Tr. II at 190-91.)  Petitioner claimed that the first incident occurred after Sarah walked up to him while he was laying on the couch and put his hand down her pants.  (Tr. II at 191.)  After that, Petitioner admitted to initiating the contact.  (Tr. II at 191-92.)  Petitioner, however, denied that he ever had any sexual contact with Kim or Stacie Galbreath, or any other child.  (Tr. II at 171-75, 188.)  The testimony of Sarah Tighe and her two cousins was offered to show that Petitioner had a pattern of sexually molesting young girls.  It

-46-

was not improper for the prosecutor to call Sarah to rebut Petitioner's testimony that Sarah initiated the first sexual encounter between them by putting his hand down her pants.

6.    *Cumulative Error*

Petitioner contends that the prosecutor's improper actions, whether taken individually or together, deprived him of a fair trial.  Because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

B.    <u>Ground XVII</u>

In his seventeenth ground for habeas relief, Petitioner asserts that the prosecutor committed misconduct when he failed to ensure that exculpatory evidence was preserved.  Specifically, Petitioner contends that the prosecutor deprived him of his right to vindicate himself by taking a polygraph examination.  He further claims that by failing to provide him with a polygraph examination, the prosecutor denied his right to present a defense.  Petitioner raised this claim for the first time in his motion for relief from judgment.  In denying his motion, the trial court found his claims to be without merit.

The decision of the state court is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The Supreme Court has never held that, as a constitutional matter, polygraph evidence must be admitted in a criminal trial or that polygraph evidence is reliable.  *See United States v. Scheffer*, 523 U.S. 303, 309 (1998); *United States v. Thomas*, 167 F.3d 299, 308, n. 8 (6th Cir. 1999) (noting that the Supreme Court in *Scheffer* "acknowledged that there is no consensus in the scientific community that polygraph evidence is reliable, and that there is no constitutional right to have polygraph evidence admitted at trials").  The

admissibility of polygraph evidence is generally a state law matter which does not raise issues of constitutional magnitude cognizable on habeas review.  *See Bolton v. Berghuis*, 164 F. App'x 543, 550 (6th Cir. 2006); *Maldonado v. Wilson*, 416 F.3d 470, 477–78 (6th Cir. 2005) (collecting cases); *see also Poole v. Perini*, 659 F.2d 730, 734–35 (6th Cir. 1981).  Accordingly, to the extent that Petitioner claims that he was entitled to a polygraph examination under state law, he is not entitled to relief from this Court because such a claim is not cognizable upon federal habeas review.

To the extent that Petitioner asserts that he was denied due process or his right to present a defense, this claim also fails.  While Michigan law provides that a defendant charged with first-degree criminal sexual conduct "shall be given a polygraph examination or a lie detector test if the defendant requests it," MICH. COMP. LAWS § 776.21, Petitioner does not allege that he requested a polygraph from the state.  In fact, it appears that Petitioner underwent a polygraph examination by a privately retained examiner.  Even if Petitioner had requested and polygraph examination from the state and passed, the results of a polygraph examination are inadmissible at trial under Michigan law.  *See People v. Phillips*, 666 N.W.2d 657, 661 (Mich. 2003); *People v. Jones*, 662 N.W.2d 376, 382 (Mich. 2003).  Because any results from a polygraph would have been inadmissible, Petitioner cannot establish prejudice.  Petitioner, therefore, is not entitled to habeas corpus relief.

## VI.    Sentencing Claims: Grounds III, IV, XIII and IX

Petitioner's third, fourth, eighth and ninth grounds for relief concern alleged sentencing errors.

### A.    Upward Departure

In Ground III, Petitioner contends that the trial court erred by departing upward from the sentencing guideline range with regard to his conviction for CSC I.  Petitioner argues that the

reasons provided by the court were not substantial and compelling, nor were they objective and verifiable, as required by statute.

   After a thorough analysis, the Michigan Court of Appeals concluded that Petitioner failed to establish a sufficient basis for disturbing the trial court's determination that substantial and compelling reasons existed to depart from the guideline range.  The court further found that, the extent of departure, 30 months, was not an abuse of discretion.  The court of appeals explained:

   According to the sentencing information report, defendant's recommended minimum sentence range under the legislative guidelines was 126 to 210 months' imprisonment, given defendant's prior record variable (PRV) level of D and offense variable (OV) level of IV. *See* MCL 777.62. The trial court imposed a minimum sentence of 20 years' (240 months') imprisonment, departing upward from the maximum-minimum sentence recommended under the legislative guidelines by 30 months. The trial court based the departure on the gravity of the offenses given the Legislature's recent imposition of harsher penalties for CSC-1 convictions, the fact that defendant sexually assaulted a minor female family member, and the inadequacy of PRV 7 to reflect the extent of defendant's crimes.

   The trial court first concluded that upward departure was warranted in part because of "how serious the crime is viewed by society in light of the penalty provisions it now carries." The Legislature's amendment to include a 25-year minimum sentence for CSC-1 in certain cases keenly and irresistibly grabs our attention and is of considerable worth in deciding the length of defendant's sentence. *Babcock*, 469 Mich at 258. In *People v Armstrong*, 247 Mich App 423, 425; 636 NW2d 785 (2001), this Court noted that "the need to protect other children by the sentence imposed is another factor not adequately considered by the guidelines." The trial court's reason for upward departure rests on an implicit understanding that society views the instant offenses as particularly serious because they were against a child, and this departure meets the goal of protecting young children from future abuse. *Id*. We conclude that this reason for upward departure was objective and verifiable, *Smith*, 482 Mich at 300, and was not an abuse of discretion, *Babcock*, 469 Mich at 269.

   Next, the trial court found the victim's vulnerability to be a basis for the upward departure. Although defendant was scored ten points for OV 4, MCL 777.34 (addressing psychological injury to a victim), and 15 points for OV 10, MCL 777.40 (addressing exploitation of a vulnerable victim), this Court has previously held that such scores can be inadequate to address the particularly abhorrent nature of some criminal sexual conduct cases involving children. *See People v Kahley*, 277 Mich App 182, 190-191; 744 NW2d 194 (2007). Moreover, "all CSC-1 cases do not wreak

the same amount of damage." *Smith*, 482 Mich at 310. In this case, there was testimony that defendant performed sexual acts on several prepubescent females for over 30 years. Notably, according to the victim's testimony, defendant sexually assaulted her from 50 to 100 times between the time she was 8 and 12 years of age. Defendant sexually assaulted the victim when she stayed overnight at his residence in order to visit her grandmother. The OV scores did not adequately reflect the young victim's vulnerability to repeated sexual assault at the hands of defendant, and this reason given by the trial court for the upward departure was objective and verifiable. *Id*. at 300. The number of alleged instances of sexual abuse over that period of years keenly and irresistibly grabs our attention and is of considerable worth in deciding the length of defendant's sentence. *Babcock*, 469 Mich at 258. Thus, this stated reason for the upward departure did not constitute an abuse of discretion. *Id*. at 269.

Finally, the trial court based the upward departure on the inadequacy of PRV 7, MICH. COMP. LAWS § 777.57 (subsequent or concurrent felony convictions), to properly reflect the circumstances of this case. "[A] trial court may not depart from the recommended minimum on the basis of a defendant's prior record unless the trial court first finds that the sentencing guidelines gave inadequate or disproportionate weight to the defendant's criminal history." *People v Young*, 276 Mich App 446, 454; 740 NW2d 347 (2007).

We note that the trial court failed to determine the effect of this factor on the recommended minimum sentence range to ascertain whether the factor was given inadequate or disproportionate weight in the guidelines calculations. *Id.* at 451. However, we deem this failure to be harmless. MCR 2.613(A). A trial court may score PRV 7 at 20 points when "[t]he offender has 2 or more subsequent or concurrent convictions." MCL 777.57. In this case, defendant was convicted of three counts of CSC-1 and three counts of CSC-2 for sexually abusing his minor step-granddaughter over a period of several years. "[T]he trial court's determination that the guidelines failed to adequately consider the similar nature of defendant's pattern of felony crimes, and the aggravating circumstances," provide a satisfactory reason for upward departure. *People v Petri*, 279 Mich App 407, 421-422; 760 NW2d 882 (2008). *See also Babcock*, 469 Mich at 258 n 12. The inadequacy of the PRV 7 score and the number of felonies committed in this case keenly and irresistibly grab our attention and are of considerable worth in deciding the length of defendant's sentence. *Id*. at 258. It is undisputed that defendant was convicted of six felonies; therefore, this basis for upward departure was objective and verifiable. *Smith*, 482 Mich at 300. In sum, we conclude that defendant has not established a sufficient basis for disturbing the trial court's determination that substantial and compelling reasons existed to depart from the guidelines' recommended range for the minimum sentence. Moreover, the degree of departure, 30 months, was not an abuse of discretion. A minimum sentence of 240 months' imprisonment is within the range of reasonable and principled outcomes. *Id*. at 268-269.

*Tighe*, 2010 WL 1779905 at *7-8.

Any alleged error in departing from the recommended minimum guideline range does not merit habeas relief. *See Austin v. Jackson*, 213 F.3d 298, 300–01 (6th Cir. 2000) (state court did not abuse its discretion nor violate federal due process by imposing a sentence above the state sentencing guidelines); *Cheatham v. Hosey*, 12 F.3d 211, 1993 WL 478854, *2 (6th Cir. Nov. 19, 1993) (departure from state sentencing guidelines is a state law issue not cognizable on federal habeas review). State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review"); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.'" *Austin*, 213 F.3d at 301, quoting *Williams v. New York*, 337 U.S. 241, 245 (1949). At the time of his conviction, CSC I was punishable by imprisonment for life or for any term of years. *See* MICH. COMP. LAWS § 750.520b(2). Consequently, Petitioner's sentence of 20 to 40 years was within the statutory limits.

### B.     Proportionality

Petitioner argues in Ground IV that his sentence was disproportionate. The Michigan Court of Appeals rejected Petitioner's claim, stating:

> Further, we find that the sentence was proportionate. We review the proportionality of the sentence under an abuse of discretion standard. *People v Milbourn*, 435 Mich 630, 634-635; 461 NW2d 1 (1990). "[T]he principle of proportionality . . . defines the standard against which the allegedly substantial and

compelling reasons in support of departure are to be assessed." *Babcock*, 469 Mich at 262. As such, we must determine "whether the sentence is proportionate to the seriousness of the defendant's conduct and to the defendant in light of his criminal record." *Id*.

In this case, the trial court provided no explanation for the extent of the departure other than the reasons offered to impose a departure sentence. Defendant's CSC-1 crimes are classified as class A felonies. Defendant had a total PRV score of 45 points, which corresponds to PRV level D, and a total OV score of 75 points, which corresponds to OV level IV; accordingly, defendant's recommended minimum sentence range was 126 to 210 months' imprisonment. MCL 777.62. However, defendant was sentenced to a minimum of 240 months. Our Supreme Court has suggested that courts compare a defendant's actual minimum sentence to the recommended minimum sentences for offenders with similar criminal histories to determine whether the defendant's sentence may be proportionate. Smith, 482 Mich at 308. Here, the prosecution charged defendant under MCL 750.520b(2)(b), which provides that CSC-1 is a felony punishable as follows: "For a violation that is committed by an individual 17 years of age or older against an individual less than 13 years of age by imprisonment for life or any term of years, but not less than 25 years." The trial court did not impose defendant's sentences under this provision, concluding that the instant offenses occurred before this provision's effective date of August 28, 2006. Nonetheless, the amended statute now sets a minimum sentence for the offense committed by defendant. Other defendants convicted of the same crime are being sentenced to a greater minimum.

Moreover, we find it significant that when defendant committed the instant offenses, he could have been charged as an habitual offender, second offense, as a result of his 1995 felony assault conviction. A second-time offender with similar PRV and OV levels would have had a recommended minimum sentence of no more than 262 months. MCL 777.21(3)(a); MICH. COMP. LAWS § 777.62. Defendant's 240-month minimum sentence is below that maximum-minimum sentence. In comparing defendant's sentences to the sentences recommended for other offenders who committed the same type of crime, we conclude that defendant's sentences are proportionate. *See Smith*, 482 Mich at 309. Defendant's CSC-1 sentences were not disproportionate, given that they involved multiple sexual assaults of a minor female spanning several years, defendant pleaded guilty to assault arising from similar instances of sexual abuse against his minor daughter, and defendant had committed similar acts against other minor females. In ascertaining whether a departure was proper, we defer to the trial court, acknowledging its "extensive knowledge of the facts and that court's direct familiarity with the circumstances of the offender." *Babcock*, 469 Mich at 270. In this case, there was no abuse of discretion regarding the extent of the departure. *Milbourn*, 435 Mich at 634-635.

*Tighe*, 2010 WL 1779905 at *9.

-52-

Petitioner contends that his sentence was disproportionate under the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990). Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). A federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. 28 U.S.C. § 2254(a); *Bradshaw*, 546 U.S. at 76; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action.

C.    Guideline Scoring

In Ground VIII, Petitioner asserts that the trial court's scores for Offense Variables 4, 10 and 13 are invalid because they were based upon inaccurate information. He further claims that his constitutional rights were violated when the trial court used facts to increase his sentence that had not been proven beyond a reasonable doubt to a jury. After reviewing each of the challenged offense variables, the Michigan Court of Appeals concluded that the trial court did not abuse its discretion in scoring the guidelines. *Tighe*, 2010 WL 1779905 at *10. The court of appeals also rejected Petitioner's claim that his sentence violated the principles expressed by the Supreme Court in *Blakely v. Washington*, 542 U.S. 296 (2004). *Id*. at *11.

Petitioner's claim regarding the scoring of offense variables must fail as there is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)). Because Petitioner's claim is grounded in state law, it is not cognizable on habeas review. *See Bradshaw*, 546 U.S. at 76; *Pulley*, 465 U.S. at 41.

Petitioner argues that the trial court violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt. Petitioner bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond

the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely.* *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

Subsequently, in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013), the Supreme Court held that the *Apprendi* line of cases applies equally to mandatory minimum sentences. Shortly thereafter, the Michigan Court of Appeals concluded that *Alleyne* only prohibited judicial factfinding used to determine a mandatory minimum sentence, but had no impact on judicial factfinding in scoring the sentencing guidelines producing a minimum range for an indeterminate sentence, the maximum of which is set by law. *See People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013). The Sixth Circuit also concluded that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violated the Sixth

Amendment.  *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013).  As a consequence, the Sixth Circuit held, the question is not a matter of clearly established Supreme Court precedent.  *Id.* (citing *Montes v. Trombley*, 599 F.3d 490, 498 (6th Cir. 2010)); *see also Saccoccia v. Farley*, 573 F. App'x 483, 485 6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory *statutory* minimum [are] part of the substantive offense.'. . . It said nothing about guidelines sentencing factors . . . .) (quoting *Alleyne*, 133 S. Ct. at 2161 (emphasis added)).

Recently, however, in *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), in a 5-2 decision, the Michigan Supreme Court held to the contrary.  The court reasoned that, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range," they increase the "mandatory minimum" sentence under *Alleyne*.  *Lockridge*, 870 N.W.2d at 364 (emphasis in original).  As a consequence, the *Lockridge* court held that the mandatory application of Michigan's sentencing guidelines was unconstitutional, and the remedy was to make them advisory only.

The Michigan Supreme Court's decision in *Lockridge* does not render the result "clearly established" for purposes of habeas review.  This Court may consider only the "clearly established" holdings of the United States Supreme Court.  *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  For the same reasons, it may not consider the holdings of the state courts.  Instead, this Court may only grant relief on habeas review if the state court's application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.  "[R]elief is available under § 2254(d)(1)'s

unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706-07 (quoting *Harrington*, 562 U.S. at 103).

As is apparent from the reasoned decisions of the Michigan Court of Appeals in *Herron*, 845 N.W.2d at 539, and the Sixth Circuit in *Kittka*, 539 F. App'x at 673, and *Saccoccia*, 573 F. App'x at 485, as well as the decision of the dissenting justices in *Lockridge* itself, reasonable jurists could and did disagree about whether *Alleyne* applied to the calculation of Michigan's minimum sentencing guidelines. *Alleyne* therefore did not clearly establish the unconstitutionality of the Michigan sentencing scheme.

## D.   Resentencing

In Ground IX, Petitioner maintains that if this Court finds that the trial court misscored the sentencing guidelines as argued in Ground VIII, he is entitled to resentencing under the reduced guideline range. Because Petitioner's sentencing claims are non-cognizable or are without merit, he is not entitled to resentencing.

## VII.   **Failure to Remove Biased Juror: Grounds X and XI**

Petitioner contends in Ground X that he was denied his right to a fair trial and impartial jury when the trial court failed to remove, *sua sponte*, a biased juror for cause. Petitioner further argues in Ground XI that his trial counsel was ineffective for failing to remove a biased juror.

On appeal, the Michigan Court of Appeals found that Petitioner failed to properly preserve his claim at trial because he did not object during voir dire and expressed his satisfaction with the jury. *See Tighe*, 2010 WL 1779905, at *7. Nevertheless, the court of appeals found that Petitioner failed to demonstrate that the challenged juror was biased thus requiring the trial court was to excuse the juror for cause. *Id*. As previously discussed, Petitioner's failure to make a

-57-

contemporaneous objection caused him to default his claim in the state court.  *See Wainwright*, 433 U.S. at 86-88.  However, when the claim clearly is without merit, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16.

Petitioner asserts that the trial court failed to adequately examine whether Juror Cox could render a fair and impartial decision verdict in his case.  The following exchange took place during voir dire:

> THE COURT: Any problems come to mind for you based on these questions I've been asking.

> JUROR COX: I'm a little back and forth I guess.  A few issues: One, my husband was and is employed by the state, was involved in Child Protective Services for many years, but due to an emotional situation moved on with another department.  He's presently with liquor control.  A lot of connection with law enforcement, a lot of conversations in the home, you know, that sort of thing.  Whether or not that means anything, I mean, I'm trying to determine, you know, I would try to be fair, but honestly I would be extremely critical, and my son is going to be a lawyer.

> THE COURT: Was your husband at some period of time a child protective services case worker or was he in a management position?

> JUROR COX: He was a case worker, and moved on to delinquency.

> THE COURT: You said he did that many years, right?

> JUROR COX: Oh, yeah.

> THE COURT: Is he still engaged in that type of work?

> JUROR COX: He's presently with liquor control.

> THE COURT: That's right.  So there's been a lot of discussions in the home about his work and his involvement with children?

> JUROR COX: Correct, and he works out of the home periodically, so like I say there's law enforcement, a lot of people I know.

***

THE COURT: Do you think that you can be a fair juror, I mean, if you were for example on trial or if you were the prosecutor, would you be comfortable with a juror such as yourself, feel that you would decide it fairly?

JUROR COX: I guess it's a learning experience for me.  As I sit here and listen, you know, I think I'm okay, I'm a fair person, but then I find I'm critical just from my background and what I'm surrounded with, and I guess there's a lot of discussion and I tend to knit-pick, just so you know.

***

THE COURT: Any other concerns or problems other than those that you've just verbalized?

JUROR COX: Just missing work, we're running shorthanded.  I'm running the front. It's pulling our hygenist and people away from patients having to do my job, being gone, I mean he will work with me, but you know you're talking a few days, you know, it's causing a little anxiety for me and I'm not going to lie.

THE COURT: Anything else that you wanted to tell us or does about cover it?

JUROR COX: That covers it.

(Tr. I at 89-92.)

The Supreme Court has acknowledged the "traditionally broad discretion accorded to the trial judge in conducting voir dire." *Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991) (quoting *Ham v. South Carolina*, 409 U.S. 524, 528 (1973)).  "Despite its importance, the adequacy of voir dire is not easily subject to appellate review.  The trial judge . . . must reach conclusions as to impartiality and credibility by relying on [his or her] own evaluations of demeanor evidence and of responses to questions." *Mu'Min*, 500 U.S. at 424 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)).  However, a trial court's broad discretion in the conduct of voir dire is nevertheless "subject to essential demands of fairness." *Wolfe v. Brigano*, 232 F.3d 499, 504 (6th

Cir. 2000) (Wellford, J., concurring) (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).  "At stake is [Petitioner's] right guaranteed by the Sixth Amendment to an impartial jury; the principal way this right is implemented is through the system of challenges exercised during the voir dire of prospective jurors."  *Nell*, 526 F.2d at 1229 (citing *Swain v. Alabama*, 380 U.S. 202 (1965)).  A defendant may obtain a new trial if an impaneled juror's honest responses to questions on voir dire would have given rise to a valid challenge for cause.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  "Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias."  *Virgin Islands v. Felix*, 569 F.2d 1274, 1277 n. 5 (3d Cir. 1978).

In this case, the trial court continued to question Juror Cox after she expressed uncertainty over her ability to be impartial due to her husband's previous employment as a case worker for Child Protective Services.  After examining Juror Cox about her husband's employment history, the trial court directly asked whether she could be a fair juror.  Juror Cox responded, "I think I'm okay, I'm a fair person."  While Juror Cox added that she was "critical" and tended to "knit-pick," being critical or picky does not equate with bias.  A juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias.  *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001).  The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on voir dire."  *Id.*  (citing *Patton v. Yount*, 467 U.S. 1025, 1032 (1984)).

This case is distinguishable from *Hughes*, which Petitioner relies upon in support of his claim.  The juror in Hughes stated that she had friends and relatives on the police force and explicitly stated, "I don't think I could be fair."  *Hughes*, 258 F.3d at 456.  Neither the trial court nor

defense counsel offered any response or follow-up questions to the juror's declaration. *Id*. at 458. In light of the juror's unequivocal statement that he could not be fair, the Sixth Circuit found bias. The court continued, "Further, because [the juror's] declaration was not followed by an attempt at clarification or rehabilitation, there is no ambiguity in the record as to her bias; [the juror's] express admission is the only evidence available to review." *Id*. at 459. In this case, Juror Cox never stated that she could not be fair and impartial. Moreover, the trial court continued to question Juror Cox after she expressed some uncertainty as to her ability to be fair until the court was satisfied with her response.

Furthermore, the question of bias of an individual juror at a state criminal trial is one of fact. *Dennis,* 354 F.3d at 520 (citing *Patton,* 467 U.S. at 1036); *see also Sizemore v. Fletcher,* 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). A state court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding and not simply erroneous or incorrect. *Keith v. Mitchell,* 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams,* 529 U.S. at 409-11); *see also Young v. Hofbauer,* 52 F. App'x 234, 237 (6th Cir. 2002). The state court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner failed to rebut trial court's finding of impartiality by clear and convincing evidence.

Petitioner also claims that his trial counsel was ineffective for failing to strike Juror Cox. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell

below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

"Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001); *see also United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) ("The primary purpose of the voir dire of jurors is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel"). However, counsel is accorded particular deference when conducting voir dire. *Hughes*, 258 F.3d at 457. An attorney's actions during voir dire are considered to be matters of trial strategy. *Id.* A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. *Id.* To show prejudice arising out of trial counsel's failure to

challenge a juror, Petitioner must show that the juror was biased against him.  *Johnson v. Luoma*, 425 F.3d 318, 328 (6th Cir. 2005).  If a biased juror was impaneled, "prejudice under *Strickland* is presumed, and a new trial is required."  *Hughes*, 258 F.3d at 463.

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.  As set forth above, Petitioner failed to demonstrate that Juror Cox was biased against him.  Petitioner, therefore, cannot show prejudice for purpose of his ineffective assistance of counsel claim.  Consequently, he is not entitled to habeas corpus relief on Grounds X or XI.

VIII.   **Jurisdiction of the Trial Court: Ground XVI**

In his sixteenth ground for habeas corpus relief, Petitioner contends that he is entitled to immediate release from custody because the trial court arraigned him without first acquiring subject matter jurisdiction.  Petitioner claims that the felony complaint was constitutionally defective because it was not dated, not signed by the complainant or accompanied by an affidavit.  Petitioner raised his claim for the first time in his motion for relief from judgment.  In its order denying Petitioner's motion, the trial court found the claim to be meritless.

As previously discussed, "'[F]ederal habeas corpus relief does not lie for errors of state law.'"  *Estelle*, 502 U.S. at 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).  Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," and does not encompass reexamining state-court determinations of

state-law issues. *Id*. at 68. The determination of whether a state court had jurisdiction under state law is properly made by the state courts, not the federal judiciary. *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976); *see also Poe v. Caspari*, 39 F.3d 204, 207 (8th Cir. 1994) ("Jurisdiction is no exception to the general rule that federal courts will not engage in collateral review of state court decisions based on state law: The adequacy of an information is primarily a question of state law and we are bound by a state court's conclusion respecting jurisdiction . . . . This determination of jurisdiction is binding on this [federal] court." (internal quotation omitted)). In addition, federal due process does not require state officials to follow their own procedural statutes and rules. *Sweeton v. Brown*, 27 F.3d 1162, 1165 (6th Cir. 1994).

In this case, Petitioner's claim that the state circuit court lacked jurisdiction over his criminal case is based solely upon alleged non-compliance with state law and, therefore, is not properly before this Court.

### IX.   Ineffective Assistance of Trial Counsel: Grounds V and XVIII

Petitioner raises numerous instances of alleged ineffective assistance of counsel in Grounds V, XI and XVIII of the petition. In Ground V, Petitioner claims that defense counsel rendered ineffective assistance by failing to either object to improper expert testimony at trial or to obtain an expert witness to rebut the prosecution's expert witness. Petitioner further argues in Ground XVIII that counsel was ineffective when he refused to prepare a trial strategy, refused to interview witnesses, failed to protect Petitioner's right to submit to a polygraph examination, failed to inform Petitioner that he passed a private polygraph examination and failed to object to the instances of prosecutorial misconduct set forth in the petition.

To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687-88.

A.   Ground V

Petitioner contends that defense counsel rendered ineffective assistance by failing to either object to improper expert testimony at trial or to obtain an expert witness to rebut the prosecution's expert witness. This claim was first raised by appellate counsel on direct appeal. In rejecting Petitioner's claims of ineffective assistance of counsel, the Michigan Court of Appeals stated, "We have thoroughly reviewed the record and conclude that defendant ultimately failed to overcome a strong presumption that defense counsel's performance constituted sound trial strategy." *Tighe*, 2010 WL 177905, at *5.

As discussed above, Petitioner failed to establish that Dr. Henry's testimony was improper. Counsel's failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

Moreover, Petitioner cannot show that counsel was ineffective for failing to call an expert to rebut the Dr. Henry's testimony. Counsel's strategic decisions regarding what witnesses to call at trial are "virtually unchallengeable." *Awkal*, 613 F.3d at 641. The Court's "concern is not to decide, using hindsight, what [it] think[s] would have been the best approach at trial. Instead, [the Court] consider[s] only if the approach ultimately taken was within 'the wide range of reasonable

professional assistance' given the circumstances." *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689). Here, counsel could have reasonably concluded that an expert witness was not necessary to rebut the testimony given by Dr. Henry. Counsel conducted extensive voir dire of Dr. Henry regarding his qualifications, particularly his expertise concerning grooming behaviors. (Tr II, 75-78.) In addition, Defense counsel cross-examined Dr. Henry on the issues of grooming behavior and delayed reporting. (Tr II. 97-105; 108-09.) For example, defense counsel elicited testimony from Dr. Henry that but for an accusation of sexual abuse, the type of behaviors that are considered grooming could be completely normal. (Tr. II, 97-99.) Defense counsel also questioned Dr. Henry regarding his personal research and methodology on delayed reporting and questioned the validity of the Child Sexual Abuse Accommodation theory upon which Dr. Henry relied. (Tr. II, 100-104.)

Moreover, as the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Applying this "doubly" deferential standard, I cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of *Strickland*.

B.    Ground XVIII

In Ground XVIII, Petitioner asserts that his trial counsel was ineffective when he refused to interview witnesses and prepare a defense strategy, refused to protect Petitioner's right under Michigan law to submit to a polygraph and failed to inform Petitioner or the prosecutor that he passed a private polygraph examination, and refused to object to instances of prosecutorial misconduct, all for the purpose of sabotaging the defense.  The claims of ineffective assistance of counsel raised in Ground XVIII were presented for the first time in Petitioner's motion for relief from judgment.  The trial court denied the motion for lack of merit.

Plaintiff's allegations regarding counsel's failure to prepare for trial and interview witnesses is wholly conclusory.  Plaintiff does not identify the names of any witnesses that counsel failed to interview or how their testimony would have benefitted the defense.  Moreover, it is clear from a review of the trial transcripts that defense counsel formulated a defense strategy.  This case, like many CSC cases, was a credibility contest between the victim and Petitioner.  Defense counsel's strategy throughout the case was to impugn the victim's credibility by emphasizing her delay in reporting, and the inconsistencies and lack of detail in her story.  Counsel's strategy was entirely reasonable under the circumstances. The fact that counsel's strategy ultimately was unsuccessful does not mean that counsel was ineffective.  *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (holding that "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

Petitioner's claim of ineffective assistance of counsel concerning the polygraph examination also is without merit.  As discussed above, the results of a polygraph examination are inadmissible at trial under Michigan law.  *See People v. Phillips*, 469 Mich. 390, 397, 666 N.W.2d

657 (2003); *People v. Jones*, 468 Mich. 345, 354, 662 N.W.2d 376 (2003). Because the results were not admissible at trial, Petitioner cannot show prejudice. I also concluded above that Petitioner's claims of prosecutorial misconduct were without merit. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See, e.g.*, *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *Seymour v. Walker*, 224 F.3d 542, 556 (6th Cir. 2000); *Bradley v. Birkett*, 192 Fed. App'x 468, 475 (6th Cir. 2006). Counsel, therefore, cannot be found ineffective for failing to raise objections to the prosecutor's alleged misconduct. Accordingly, the state court's decision was not contrary to or an unreasonable application of *Strickland.*

## X.   Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for failing to raise the issues presented in his motion for relief from judgment. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Petitioner cannot meet his burden.  Appellate counsel filed a fifty-page appellate brief raising five claims of error.  With the assistance of appellate counsel, Petitioner also filed a *pro se* "Standard 4" supplemental brief raising nine additional claims.  Petitioner, therefore, had the opportunity to raise whatever claims he desired on direct appeal.  Moreover, I concluded above that the claims presented in Petitioner's motion for relief from judgment are without merit.  Consequently, Petitioner cannot show prejudice resulting from appellate counsel's failure to raise the issues on direct appeal.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: May 17, 2016                                            /s/ Ellen S. Carmody
                                                                    ELLEN S. CARMODY
                                                                    United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).